on the bench with us today and tomorrow. We very much appreciate your service to the Ninth Circuit Court of Appeals. I've been coming here since 1978. I know, and we appreciate it. Actually, I don't know. I wasn't on the court then. Secondly, may I remind particularly counsel for appellants that our clock starts running from the total amount of minutes that we have allocated, that is 20 minutes or 10 minutes. So if you don't want to be disappointed and if you do want to have time for rebuttal, you're just simply going to have to stop with some time remaining because we will not dispense extra minutes unless it is necessary to equalize the time consumed with the counsel for appellees. And thirdly, we understand that counsel for cables and accessories in the cables matter is unable to be here on account of a medical emergency. The court would be happy to submit the case. Obviously, counsel for Brewer is entitled to argue if he insists on it, but we would be pleased to submit the case on the briefs. So is he here? I don't know. Is counsel here? All right. Well, the court has no questions, so you may take that into consideration in deciding whether you wish to make a short statement. All right. We'll hear argument in the first matter on the calendar, which is Gonzales v. Anderson. Good morning, Your Honors. James Andre Bowles for Mr. Gonzales. I would first like to start this argument with a little background, and that is about the setting and the sort of involvement of the parties, and that is the setting in this case is Elko, Nevada, at the Nevada Youth Training Center, a detention facility or school, I think it's called most of the time, for wayward young men. Mr. Gonzales was hired there in 1998 in the summertime, and he was hired to work as one of the caretakers for the wards. It's kind of like a juvenile prison system, except it's in an open area. Now, that's the setting. The law that I would like to refer to in this case, there's two cases that were recently decided by this court. One was the Kozalter case, which is our sole authority in our reply brief, and the other one is the Vasquez case, which was recently brought to the attention of the court by the appellee. Now, Kozalter, Your Honor, C-O-S-Z-A-L-T-E-R. That's in our table of cases in our reply brief. Kozalter dealt with a termination of- The point here is really fairly focused. It seems to me it has to do with the two statements that Gonzales says that he made to Anderson and Wormuth, I believe is the other gentleman's name. Wormuth, yeah. He told Anderson, when he first met with Anderson, if I understand it correctly, he asked whether the institution had a use-of-force policy. Anderson said no, and Gonzales volunteered to write one. Then on December 1st, he met with Anderson and- Wormuth, Your Honor. Wormuth, and he touched on the abuse-of-force issue. That, as best I can tell, is the entirety of the record with respect to what he said to those individuals. So my question is, assuming that he said exactly what he said he said, and assuming that it's protected speech, how does that evidence suffice to show, set against the numerous recorded incidents of difficulty with the way Gonzales performed his job, that it was a substantial or motivating factor in his discharge? Well, Your Honor, if you look at the totality of circumstances- I'm looking at the statements that he made to the people who made the recommendation and the decision to terminate him. Well, and that's my point, Your Honor. If you look at what was discussed, this was not discussed in a vacuum. It wasn't after he had read the policy manual and said, you have no policy. This was in a situation where, over a period of time, they noticed that Gonzales appeared to be soft on the kids. And he had a problem with use of force in the facility. Well, the problem is you have to tie it to the people who made the decision to terminate him. Now, I know and I appreciate the fact that you say he had lots of conversations with lots of staff people about use of force, but there is no evidence that Anderson or Wormuth knew about it. To the contrary, Your Honor. He went to Anderson and he said, we need a use of force policy. The suggestion, obviously, is not that we need a use of force policy because there is none. The suggestion is that we need a use of force policy because your people don't have any rules. He didn't say that, though. There's no evidence that he said that. I repeated precisely what he said he said to Anderson when he first arrived and to Anderson and Wormuth on December 1st. Well, that's part of the record, Your Honor, but that's not the entire record. Let me ask it another way. Is there any evidence that Supervisors Anderson and Wormuth knew of his conversations you have in your brief with numerous other coworkers? The question is, were those conversations reported to Anderson and Wormuth? Those, we can't, we have no direct evidence. There's nothing in the record to show that. Is that correct? The only thing there is, Your Honor, is inference. And the inference being that in a small operation like this with the same people working the same shifts day in and day out with the same kids, and if you look at the facts here, the temporal proximity, the problems with Joe Gonzalez didn't start immediately in the first, after the first conversation where he said you have a problem with your use of force. Policy. It happened thereafter in December. Then he first started having his problems when he went back to them, and he had been there for a while, had been a standard, at least a standard employee. But then what does it turn to? What do we see in the record and in the brief by the appellee? You said inferences. What do we have besides the deposition of Gonzalez? Is there anything else in the record? Well, yes, Your Honor. What is that and where is it? If we look, we will see in the February evaluation they're talking about, comes up several times, but they're talking about Gonzalez trying to change the program. In the February evaluation, it mentions, again, the same sort of language where Gonzalez needs to forget about changing the program and go by the way that we've always done it. We've had problems in the past and we've handled them so that you need to forget. Now, these were reports that were negative as far as Gonzalez is concerned? This was his evaluation in February. He was terminated in May. Who made that evaluation? That was his supervisor. I believe in this case it would have been Wormuth. So Wormuth is writing, you need to change your policy. What other evidence is there with regard to Wormuth or Anderson in their corrective memos or in their criticisms referring to you've got to follow the policy? Well, it comes up on several occasions, but specifically what happened in the February evaluation was that, and it's in their brief on page six, it's quoted, you want to make changes in our established procedures and you were told that you needed to learn our procedures, as they have served the program well for many years. All right. Now, let me ask you this. Since your client had testified that he wanted to make changes or wanted a policy with regard to punishments and use of force, is there an inference that a jury could draw that the statements about policy really reflected, without saying so, you, Gonzales, better cut it out and do what we have been doing and quit trying to change what's going on here with specific reference to his objections to the use of force? That's a very, to me, it's important. Now, what do you say to that? Well, I agree, Your Honor. I'm not saying, I don't agree to anything. I just want your evaluation. Tell me why that's important. Well, Your Honor, let's look at the entire, all the circumstances. To start with, he has a meeting with them and tells them you don't have a use of force policy. Nothing happens. He's okay. He was told they had a policy. Well, he was told they had a policy, but basically the argument was your policy doesn't say anything, that you cannot use anything except reasonable force. So he's a former police officer, a former chief of police. He goes back to them or he goes to them and says this is the way a use of force policy is. I've done them. I can write it. It tells you what force you can use, how you report it, how you track it so that these things don't happen again. That's the kind of use of force policy that he's speaking of to these people. And that's in September he brings it up. He goes back in December and he brings it up again. Well, that was where things started to change for him. From that point, he went from a good employee to a lousy employee. And what do they talk about? What do they tell him when he brings it up in the second meeting? They call him a liar. You're a liar, Joe. And that cuts off the conversation. From that point in, from that point on, they speak of in their criticism of this man that he is being too soft on these juveniles. What's that related to? He's being too soft because use of force, as he's seen it used there, is inappropriate. So what happens in later, and this is in their brief on page 6, they're talking about his refusal to follow procedures, their procedure. The inference is that our procedures, that is, when these kids get out of line, we slap them in the face or we knock them down. Well, you know, there's no such inference that's possible from, for example, letting five kids go unescorted to get their hair cut. That has nothing to do with any kind of force. That's just plain stupid, isn't it? Your Honor, and that's the rest of our case, is that was the sort of thing that was done by other people. There's nothing to, there's no evidence that that wasn't a perfectly legitimate difficulty with the way Gonzalez performed his job. Well, but I believe there's his testimony that that was the sort of thing that was done by other supervisors. And in his case, after the second meeting and after it was seen that he didn't want, he didn't approve of their use of force, then he started getting written up for things like that. Very, there's very few, there's nothing there. And that's why I started to talk about Vasquez. In the Vasquez case, there was a very clear act of insubordination that brought about his termination. This Court decided that case 2-1. It was actually a split decision. But if we look at the nature of these alleged violations or these alleged poor performance on his part, and then we look to, none of these are very serious. None of them are serious at all. There is no serious violation. Well, but there's nothing to show whether they are or they aren't. That's the problem. There's just no evidence. Well, I would agree, Your Honor, that needs to be developed. That's why this matter should not have been decided on a summary judgment. It's a different issue. But, I mean, that actually is a two-edged sword. It cuts against them as well as against us. But we do have some clear evidence, Your Honor, and the clear evidence is that this issue was, it was part of their motivating factor. It was a motivating factor. And, again, they're talking about risking security, Your Honor. They're talking about his not following procedures and then risking security. Well, when, and I brought this up earlier, that the setting is out in a rural area where you've got kids. They're not locked up. They're not really, it's not a real true maximum security for bad boys. It's kids that have maybe, you know, serious enough that they get sent away but not a setting where it's tightly controlled. So they do it by the old West standard. They slap them in the face or they knock them down or they beat them up. And Joe doesn't like that. So what are they saying? Our established procedures. There's one established procedure that we know, and that's in evidence, that is being challenged. And that is the way they use force. And Joe says to them, it doesn't work that way. You can't do that. This is the year 2000 or almost the turn of the century. And what do they tell Joe? You're not following our procedure. You're trying to change things here. Well, we know the one thing he's tried to change, and that's the only thing in the record that he's tried to change, is their use of force. So our position, Your Honor, it is clear there's a very strong inference when you look at all of the facts here. It's something that only a jury can do and make a decision, because juries have that gut sense, that ability to look. What I was going to ask you is, I know juries have a gut sense, but you've got to have evidence, too. Was there any testimony or anything in the record which supports that other than Gonzales' statement that others were using force, and that force was part of the routine in that prison? Did you have any evidence of that? Your Honor, the evidence there is what's been presented by Mr. Gonzales. It's only his testimony. You have no records of incidents that force was part of what went on in that juvenile setting? There is a long record of cases being filed against that facility and the same people, Your Honor. I don't believe it's in this record, though. People who said that force had been used against them? FBI investigations and lawsuits, Section 1983 lawsuits, alleging excessive force. A series of those. Not part of this record? Not part of this record, Your Honor. But it's something that could be. . . I think. . . Is that in the record? It's not in this record, Your Honor. I don't believe it is. You said something that's not in the record. I would agree, Your Honor. I didn't prepare the record, but. . . Okay. That is not part of this record. Your Honor, could I. . . I've got 340. You may. Thank you. Mr. Hilsbeck. May it please the Court. My name is Charles Hilsbeck. I'm a Deputy Attorney General for the State of Nevada in the Human Resources Division, and I represent the appellees in this matter. Sitting next to me is Cindy Peisel. She's the Chief Deputy Attorney General for the Human Rights or Human Resources Division of the Attorney General Office. The issue in this case is whether plaintiff, when faced with a properly supported motion for summary judgment, can rely on essentially his prima facie evidence of temporal proximity, or whether he has a duty to present affirmative evidence to rebut or to overcome the evidence that was put in the record by the defendants. Well, isn't there. . . and this is what bothers me to a degree. I realize that the State comes in with certain reasons, and which may very well be valid reasons. On the other hand, some of the nature of the complaints against this fellow, who seemed to be very well qualified, seemed to be fairly trivial and fairly correctable. And then there was all this reference to you've got to follow our policy, and that could mean you're too soft on them, and we're not going to let you get away with stopping these other people from disciplining these kids the way they ought to be disciplined. And what do you say to that? Isn't that enough for the jury to say, and we have to recognize that the record is not the same kind of record you have on the jury, but there has to be enough record. Isn't there enough evidence there that a reasonable jury could say, this looks like the motivation was his being the whistleblower, so to speak? I would respectfully say that, no, there's not, Your Honor. And if I could begin to answer that question with a brief background. Sure. Mr. Gonzalez came to work at July 27th, 1998. On one or two, three days after his first employment is when he had the first conversation with Mr. Anderson. So that would have made it toward the last part, 30th of July or so. And at that time, he said, you know, I have some prior law experience, which, by the way, are in, you know, regular law enforcement, policemen. And he had several jobs that did not last very long over a short period of time. The point being that the types and uses of force that are employed on the street are not the same types of force that's employed in a juvenile correctional setting. Essentially, they don't use force. They take all means necessary not to actually apply any force at all. And so his expertise in normal policing activities is of limited utility in a juvenile correctional setting. He offered to write a use of force policy. Mr. Anderson said, you know, we have two policies. One is prohibition of corporal punishment, and I forget what the other one was. It's in the record. There's two of them. He read them to Mr. Gonzalez at that time and said, you know, what we want you to do is we want you to learn our policies. We want you to learn this is the third day on the job. We want you to learn the job. After you've learned what's going on here and how to work in juvenile correctional facilities, if you have something to offer, come to us. We'll listen to you. He got a first what we call a three-month evaluation in the this man is on probation for one year. During that time, he has to have a three-month evaluation and a seven-month evaluation. And there's a you don't have to have it exactly on the end of the third month. There's a window you can have it. Mr. Gonzalez's happened in the first part of September, around September 12th, as I believe. So then you've got the month of August and a couple of weeks into September. He got a meets standard or whatever it was, a normal evaluation. His next evaluation didn't occur until February, and that's the one where he said needs needs to correct his deficiencies. There's evidence in the record, excerpts of record beginning somewhere around document number 135. And there's a list of all the things that Mr. Gonzalez was doing wrong. He was not filling out his time sheets, computing the points. There's a scoring system for the youth. He couldn't add a column of numbers. He couldn't order the supplies correctly. You mentioned the incident with the haircut. There's a list of things. It goes on for pages and pages. First part of December, they have another meeting, and at this time it's with Mr. Wormuth and Mr. Anderson. And once again, use of force policies are discussed. Later in the month, he's presented with a memo that says, you know, we've warned you X number of times since September about these things, and we're concerned about it. We'd like to help you learn the system. We want you to succeed. You know, let's get it on here. That goes on. He has another episode that he's written up. He gets a reprimand in January, I think, and then in February he gets his evaluation. Eventually, in May, he's terminated. The district court found and noted lots of episodes and lots of incidents and factual things about Mr. Gonzalez. One of the things they noted was that there's no direct evidence that the defendants retaliated against him at all, which doesn't mean that he can't make a case or prove his case, but he has to do it with circumstantial evidence. The court assumed these two. We argue that there was only one conversation about use of force policies, but the court assumed that there were two because it has to construe the evidence in the light most favorable to the plaintiff. He refused to refute the documented incidents in the December 3rd memo. The only thing that he argued about was the reprimand, and he said that everybody does that. That's simply no excuse. He was terminated. When he said everybody does that, is that not at least some evidence that he is being treated differently than others who allegedly did that? He said they did it, and they're not getting fired. Is that an inference to be drawn? No more, I think, Your Honor, than you could draw the inference if you're the one who gets the speeding ticket and everybody around you is speeding. I mean, yeah, what if they were doing it wrong? He happened to get caught, and my argument is they weren't doing it wrong. There's a plethora of evidence in here that Mr. Gonzalez was simply a substandard employee, and there's also evidence, inferences that can be drawn that his contact with the FBI was a result of him knowing that his job performance was poor. None of this is in the record, Your Honor, but, I mean, there's a lot of inferences that can be drawn, but the only logical inference that the district court found could be drawn from this, after considering the totality of the evidence and the surrounding circumstances, the only logical inference, is that he was terminated for poor job performance, and he really hasn't put in any evidence other than his prima facie argument about the temporal proximity, which, by the way, one of these conversations was five and a half months, and one of them was 10 months away, and so any inference that is created by that is attenuated by a long length of time. Kosalter says that you can't use a mere timing in the temporal proximity alone. You can't analyze that in a vacuum, so that if the circumstances were such that there was a long period of time, but the circumstances warranted, you could find that. Alternatively, if there's only timing evidence and it's attenuated by a long period of time, there has to be more than just an allegation of temporal proximity, and in this case, there is more. Let's assume that what you say is correct. We're on summary judgment here, and we have the Erickson test, and there are three steps in that Erickson test. Are you stopping at step two, or are you moving ahead to step three? We made a lot of arguments to the district court, but I would submit to you, as did, I believe it's Nelson v. Pima College, I think it was that one, that said that they, that the plaintiff in that case didn't meet his burden under element two, but if he did, assuming argumentatively he did, under the third element, whether the defendants would have fired him regardless of what happened or step two, I would submit that the defendants in this case, the Pelleys in this case, would meet the test under element three as well. Well, my question is, since it's on summary judgment, is it appropriate to move to step three on summary judgment? Well, what Kosalter says is that, and if I can just quote for just a moment, it said, whether an adverse employment action is intended to be retaliatory as a question of fact, it must be decided in light of the timing and surrounding circumstances. In some cases, the totality of the facts may form such a clear picture that a district court would be justified in granting summary judgment either for or against a plaintiff on the issue of retaliatory motive, but the length of time considered without regard to its factual setting is not enough. I would say yes. Where all the facts submitted on both sides of the case form such a, and the only logical inference, as the district court put it in this case, is that the defendant fired the plaintiff for his poor job performance and not for a retaliatory motive. You know, this Court has said that summary judgment is appropriate. All right. Thank you. That's fine. Any other questions? Okay. I don't think we have any other questions. Thank you. Thank you. Mr. Golas. We would ask the Court to apply what I'm going to refer to as a Casalter test, and that is temporal proximity. Was there temporal proximity? And it's clear on the facts that we have that there is temporal proximity because there are three solid pieces of evidence we can rely on. First, the first conversation about use of force policy. Secondly, the December use of force policy. Immediately, very close thereafter, we start having the problem with this employee. He becomes a problem employee after that, and then in their evaluation, their seven-month evaluation, they refer to his wanting to change the program there. So we've got this temporal proximity. That's the first one of the one way you can pass the Casalter test. Let me ask you about that, wanting to change the policy. Why does that necessarily refer to use of force? He disagreed with the way they graded people. He disagreed with a whole lot of things. So why is that reference to use of force? The only thing on the record, Your Honor, is he went to the bosses, Anderson and Wormuth, and said, talked about use of force. You know, the evidence doesn't even say he criticized it. He just touched on it. That's all. I don't know what touching on it means. Touching could mean anything. Well, exactly, Your Honor, but that is the evidence that he went to them about a use of force policy. That came from him. That was at his deposition. He's asked what he said. He said, well, we touched on it. If he had said, you know, look, your policy stinks. I've seen a whole bunch of incidents where kids are getting slapped around, and I think that's terrible. Then we've got a real case here. But when he says, well, we touched on it, that doesn't even imply that he criticized it. He offered my understanding, my recollection, Your Honor, is that he again offered to give them a use of force policy. The clear message there is your use of force is inappropriate here. You're not following a decent policy. And then when they talk about it again, his supervisors are talking about him in February. They're talking about him and his failure to go along with their program. The only thing that's come up is the use of force. During the same period of time, he has now reported the matter to the FBI. The other thing in the Casalter test. No. Well. The evidence. I would agree. But they do know that there is a you can you can infer safely infer that they have to know that there's a use of force. There's a use of force problem there. I mean, this FBI report didn't just come out of a vacuum. I don't know that before they terminate it. Well, we don't know what they know, Your Honor. We don't we can't show that. We cannot show that. But we do have a situation where he's working with these people and has been seen. And they mention it that he's soft on the kids. Can I ask you a question? Yes, Your Honor. You didn't try this case. It was never tried, Your Honor. I mean, you didn't argue the case in the lower court. I did not, Your Honor. Now, what happened to the lawyer to the lawyer, his original lawyer? Oh, he's still he's an associate of mine, Your Honor. Oh, OK. He's still involved. OK. So if this case was sent back, you folks would represent this man if there were a trial. That's correct, Your Honor. OK. And the one other thing, if I may, Your Honor, their response the second time when he touched on it was to call him a liar over it, Your Honor. So I think it's more. We understand all that. Thank you very much. Thank you, Your Honor. Both of you for your argument. And the matter just argued will be submitted. Well, next here, Eichacher versus Paul Revere.
judges: Bright, Dw Nelson, Rymer